**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **DR. CHARLOTTE BRICKHOUSE** | : | **CIVIL ACTION** |
| | : | |
| **v.** | : | **NO.  22-4596** |
| | : | |
| **SCHOOL DISTRICT OF** | : | |
| **PHILADELPHIA, SONYA BERRY,** | : | |
| **DR. MALIKA SAVOY-BROOKS** | : | |

## <u>MEMORANDUM</u>

**MURPHY, J.**                                                                                     **May 31, 2023**

I.      <u>**Introduction**</u>

      In this case, a school administrator accuses the school district she currently works for and two of her supervisors of race discrimination.  The administrator formally complained to the school district about how her supervisors treated her multiple times.  Her supervisors continually subjected her to work conditions that made it difficult to do her job.  This included not responding to her, declining her one-year-in-advance vacation request, leaving her out of meetings that were essential for her job, communicating with her direct reports instead of her, and overly scrutinizing her work attendance.

      We must assume the veracity of all well-pleaded facts as alleged and draw all inferences in favor of the administrator, and then decide whether the administrator states three plausible employment law claims: race discrimination, hostile work environment, and retaliation.  First, we hold the administrator has not made out a plausible claim of race discrimination.  The school district took no adverse employment action against her resulting in a material change to her employment status.  The administrator still works for the school district, reports to the same supervisors, and does the same job.

      Second, the administrator alleges just enough to state a plausible hostile work

environment claim.  Her supervisors frequently subjected her to conduct that interfered with her job duties, while a similarly situated employee of a different race was not.

Third, the administrator states a plausible retaliation claim.  Her supervisors took measures to discourage her from complaining to the school district after she previously filed a race discrimination complaint.

The administrator also brings a disability discrimination claim against the school district for disclosing some of her confidential medical information.  Her disability claim fails because she does not allege that her school district ever inquired about her medical condition.

Finally, the administrator brings an intentional infliction of emotional distress claim against her supervisors.  The alleged conduct does not rise to the level of extremeness required to state a claim under Pennsylvania law.

Therefore, we grant in part and deny in part the school district's motion to dismiss.

## II.   **Alleged Facts**

Dr. Charlotte Brickhouse, an African-American woman, started teaching for the City of Philadelphia School District in 2000.  DI 7 ¶¶ 11, 12.  Twenty years later, she became Executive Director of the School District's Office of Specialized Services.  *Id.* ¶ 14.  She oversaw several employees and reported to two main supervisors: Deputy Sonya Berry (her immediate supervisor)[1] and Dr. Malika Savoy-Brooks (her second-level supervisor).  *Id.* ¶¶ 9, 10.

Beginning in May 2021, the working relationship between Dr. Brickhouse and Deputy Berry became troublesome.  On numerous occasions, Dr. Brickhouse contacted Deputy Berry

---

[1] According to the School District, Sonya Berry is the Acting Deputy Chief of the Office of Specialized Services.  DI 9-1 at 2.  For clarity, we refer to her as Deputy Berry.

about job-related items, but Deputy Berry would not respond. *Id.* ¶¶ 24, 25, 26, 27, 30, 31, 32, 33, 34, 37. Deputy Berry asked Dr. Brickhouse twice to complete after-hours tasks with short turnaround times. *See id.* ¶¶ 43, 44. And Deputy Berry shared work-related information with Tracie-Marie Moody — one of Dr. Brickhouse's Caucasian co-workers who also reported to Deputy Berry — without providing the same to Dr. Brickhouse. *Id.* ¶ 36.

Around the same time, Deputy Berry held two meetings for the School District's Extended School Year (ESY) program, which Dr. Brickhouse helped support as Executive Director. *Id.* ¶¶ 22, 38, 40. Deputy Berry exhibited a "nasty" and "condescending" attitude towards Dr. Brickhouse in both meetings. *Id.* ¶¶ 38, 40. Deputy Berry's disposition led one employee to express sympathy for Dr. Brickhouse, asking her how he could "support" her after the "rough meeting" she endured. *Id.* ¶ 38. Deputy Berry did not demonstrate the same attitude towards Ms. Moody in meetings. *Id.* ¶ 41.[2]

Deputy Berry's treatment of Dr. Brickhouse created more disruption at the end of June 2021, when Dr. Brickhouse took two weeks of approved sick leave. *Id.* ¶¶ 45, 46, 77. While she was on leave, Deputy Berry told Ms. Moody that she questioned whether Dr. Brickhouse was actually sick. *Id.* ¶ 47. Deputy Berry's remark made its way back to Dr. Brickhouse after Dr. Brickhouse spoke with one of her direct reports. *Id.* And some of Dr. Brickhouse's direct reports learned about her private medical information that caused the sick leave from Ms. Moody, who had spoken to Deputy Berry. *Id.* ¶ 49.

---

[2] Dr. Brickhouse also alleges that Heidi Hertzog is another Caucasian coworker similarly situated to her that did not receive the same denigrating comments from Deputy Berry. DI 7 ¶¶ 17, 41.

This, in addition to Deputy Berry's regular neglect of work-related inquiries, caused Dr. Brickhouse to file a formal discrimination complaint with the School District. *Id.* ¶ 49. Dr. Brickhouse complained Deputy Berry discriminated against her based on her race and improperly disclosed the medical condition that caused her sick leave. *Id.* But two days after filing her complaint, Dr. Brickhouse withdrew it — fearing the School District would retaliate against one of her team members. *Id.* ¶ 50.

Deputy Berry's hostile treatment of Dr. Brickhouse persisted. Deputy Berry regularly circumvented Dr. Brickhouse by working with Dr. Brickhouse's direct reports — and not her — on tasks that fell under Dr. Brickhouse's remit. *See id.* ¶¶ 55, 59, 61, 62, 63, 67, 70, 76, 82. On August 11, 2021, Dr. Brickhouse requested time off for a vacation scheduled for August 2022. *Id.* ¶¶ 64, 68. She never received a response, but Deputy Berry's vacation request was approved for the same time. *Id.* ¶ 68.

Dr. Brickhouse's frustrations again boiled over, forcing her to reinstate her discrimination complaint on August 30, 2021. *Id.* ¶ 71. Less than one month later, she learned — "for the first time" — from Deputy Berry and Dr. Savoy-Brooks that she "was not meeting her work expectations and would be required to develop a professional leadership plan." *Id.* ¶ 80. Part of Deputy Berry and Dr. Savoy-Brooks's concerns were Dr. Brickhouse's "absences" from work. *Id.* ¶ 77. After the meeting, Deputy Berry kept frequent tabs on Dr. Brickhouse's attendance. *See id.* ¶¶ 85, 87, 89, 91, 93. She also instructed Dr. Brickhouse's coworkers not to speak to her. *Id.* ¶ 86.

The works conditions caused Dr. Brickhouse to file an Equal Employment Opportunity Commission (EEOC) charge against the School District in November 2021. *Id.* ¶ 90. She

alleged her supervisors discriminated against her because of her race and created a hostile work environment.  *Id.*  She also complained that Deputy Berry disclosed her medical information without authorization.  *Id.*

The School District responded to Dr. Brickhouse's charge on January 17, 2022.  *Id.* ¶ 96. Just five days later, Dr. Brickhouse learned from a coworker that the School District posted a job encompassing "95% of the essential functions" as her current one.  *Id.* ¶ 97.  Deputy Berry and Dr. Savoy-Brooks disputed this, explaining to Dr. Brickhouse that the new position would "not interfere with [her] job responsibilities" and would support her instead.  *Id.* ¶ 101.

The uncomfortable work relationship between Dr. Brickhouse and her supervisors did not stop.  Deputy Berry instructed Dr. Brickhouse's colleagues to leave her off meeting invitations. *Id.* ¶ 114.  She met with Dr. Brickhouse's direct reports to discuss changes to their job responsibilities without ever notifying Dr. Brickhouse.  *Id.*¶ 109.  And after Dr. Brickhouse and her colleagues missed deadlines for a team project, Deputy Berry disciplined Dr. Brickhouse, but no one else.  *Id.* ¶ 115.  At one point, Dr. Brickhouse called a meeting with her "leadership coach," who said that Deputy Berry's treatment of Dr. Brickhouse "shocked" her.  *Id.* ¶ 100.

Dr. Brickhouse received her right-to-sue letter from the EEOC on September 30, 2022. DI 1 at 31.[3]  She filed her initial complaint in federal court on November 16, 2022, bringing eight causes of action and seeking over $100,000 in damages.  *Id.* ¶ 1.  Her central theories of liability are race discrimination under Title VII of the Civil Rights Act of 1964, and unauthorized

---

[3] We may consider the right-to-sue letter because Dr. Brickhouse attached it to her complaint.  *See Lum v. Bank of Am.*, 361 F.3d 217, 221 n.3 (3d Cir. 2004).

disclosure of medical information under the Americans with Disabilities Act (ADA).  She also

sued her supervisors for intentional infliction of emotional distress.

## III.  <u>The School District's Motion to Dismiss</u>

The School District[4] wants Dr. Brickhouse's amended complaint dismissed in its entirety.

*See generally* DI 9-1.

First, the School District splits Count I of Dr. Brickhouse's complaint (race

discrimination/hostile work environment) into two pieces — arguing Dr. Brickhouse cannot state

a claim for either cause of action.[5]  It argues Dr. Brickhouse fails to show that "she experienced

an adverse employment action . . . giv[ing] rise to an inference of unlawful discrimination," thus,

she cannot state a prima facie case of race discrimination.  *Id.* at 7.  According to the School

District, Dr. Brickhouse's allegations exhibit a "laundry list of ordinary workplace slights" and

not an action that seriously and tangibly affected her employment conditions.  *Id.* at 2.

The School District also argues that the conduct Dr. Brickhouse was subjected to is not

---

[4] We refer to the School District of Philadelphia, Deputy Berry, and Dr. Savoy-Brooks collectively as the School District.  We refer to specific, individual defendants where necessary.

[5] Dr. Brickhouse sues the School District of Philadelphia specifically for race discrimination/hostile work environment under Title VII and the Pennsylvania Human Relations Act.  But she also sues Deputy Berry *in her individual capacity* for race discrimination under 42 U.S.C. § 1981.  The School District lumps together both causes of action in its argument favoring dismissal.  *See* DI 9-1 at 7.
Consistent with the School District's approach, and to streamline our analysis, we assess the Title VII, PHRA, and § 1981 claims together.  *See Castleberry v. STI Grp.*, 863 F.3d 259, 263 (3d Cir. 2017) ("In employment discrimination cases, [§ 1981] claims are subject to the same analysis as discrimination claims under Title VII of the Civil Rights Act of 1964."); *Samuel v. Target Realty, LLC*, 2021 WL 4774858, at *6 (E.D. Pa. Oct. 13, 2021) ("[R]ace-discrimination claims brought under Title VII and § 1981 are all analyzed under the same burden-shifting scheme.").

"severe or pervasive" enough to support a hostile work environment claim.  *Id.* at 13-14.  It argues that Dr. Brickhouse fails to sufficiently allege she was discriminated against because of her race.  *Id.* at 13.

Second, the School District rejects Dr. Brickhouse's claim that she was retaliated against.  *Id.* at 13-14.[6]  The School District argues that Dr. Brickhouse does not allege any actions that would have dissuaded her from making a charge of discrimination.  *Id.*

Third, the School District disputes Dr. Brickhouse's ADA claim.  The School District originally argued that Dr. Brickhouse failed to exhaust her administrative remedies and does not meet the ADA's definition of "disabled."  *Id.* at 15-17.  In response, Dr. Brickhouse not only clarified that she exhausted her administrative remedies, but also reexplained her theory of liability under the ADA.  *See* DI 10 at 14-16.  Dr. Brickhouse argues that "[s]he does not have to be a disabled person under the ADA for the confidentiality of her medical information [to] be protected."  *Id.* at 17.  Rather, she argues, the School District violated the ADA when Dr. Brickhouse's supervisors and coworkers found out about her confidential medical condition in June 2021.  *Id.*  The School District replies that the ADA provision Dr. Brickhouse cites in support of her claim[7] is inapplicable because it did not "obtain[] the disclosed medical information through an employment-related medical examination."  DI 11 at 6.

Fourth, the School District argues that Dr. Brickhouse fails to state a claim for intentional infliction of emotional distress against Deputy Berry and Dr. Savoy-Brooks because the alleged

---

[6] For the reasons discussed in footnote 3, we assess Dr. Brickhouse's Title VII retaliation claim against the School District of Philadelphia in combination with her § 1981 retaliation claim against Deputy Berry and Dr. Savoy-Brooks.

[7] 42 U.S.C. § 12112(d).

conduct does not "rise to th[e] level of severity" for a plausible claim.  DI 9-1 at 18-19.

We heard oral argument on the School District's motion.  DI 14.  We have jurisdiction over Dr. Brickhouse's claims.  *See* 28 U.S.C. §§ 1331, 1367.  The motion is ripe for decision. For the reasons discussed below, we grant in part and deny in part the School District's motion.

IV.   **Analysis**[8]

A. **Dr. Brickhouse does not state a plausible race discrimination claim because she fails to allege an adverse employment action that had a serious, tangible effect on the conditions of her employment.**

The Third Circuit has applied "[t]he familiar *McDonnell Douglas* burden shifting analysis" to discrimination claims under Title VII when direct evidence of discrimination is absent.  *Sarullo v. U.S. Postal Serv.*, 352 F.3d 789, 797 (3d Cir. 2003); *see Samuel v. Target Realty, LLC*, 2021 WL 4774858, at *8 (E.D. Pa. Oct. 13, 2021).  Part one of the *McDonnell Douglas* analysis requires the claimant to show a prima facie case of discrimination.  To do so, an employee must plausibly allege the following four elements:

(1) s/he is a member of a protected class;
(2) s/he was qualified for the position s/he sought to attain or retain;
(3) s/he suffered an adverse employment action; and
(4) the action occurred under circumstances that could give rise to an inference of intentional discrimination.

*Makky v. Chertoff*, 541 F.3d 205, 214 (3d Cir. 2008).

---

[8] We use the Third Circuit's three-step test to assess the plausibility of Dr. Brickhouse's claims.  Step one is "articulati[ng] the elements of the claim."  *Lutz v. Portfolio Recovery Assocs., LLC*, 49 F.4th 323, 327 (3d Cir. 2022).  Step two is "identify[ing] allegations that, 'because they are no more than conclusions, are not entitled to the assumption of truth.'" *Santiago v. Warminster Township*, 629 F.3d 121, 131 (3d Cir. 2010) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009)).  Step three is assuming the truth of well-pleaded allegations to decide if a plausible claim exists.  *Connelly v. Lane Const. Corp.*, 809 F.3d 780, 787 (3d Cir. 2016).

The Third Circuit has reminded courts "that the prima facie requirement for making a Title VII claim 'is not onerous' and poses 'a burden easily met.'" *Doe v. C.A.R.S. Prot. Plus, Inc.*, 527 F.3d 358, 365 (3d Cir. 2008) (quoting *Tex. Dep't of Cmty. Aff. v. Burdine*, 450 U.S. 248, 253 (1981)); *see also Casselli v. Dejoy*, 2021 WL 254554, at *4 (E.D. Pa. Jan. 26, 2021).

The School District does not dispute the first two prongs of Dr. Brickhouse's prima facie case. So, our focus starts at prong three: adverse employment action.

The Supreme Court has provided examples of what it considers "adverse employment actions" under Title VII: "hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 761 (1998). Building upon the Supreme Court's list, the Third Circuit has "added other employment decisions . . . such as placing an employee in a potentially less profitable sales position, failing to rehire someone, suspending someone without pay, and revoking a person's office, dismissing her secretary, and assigning her less work." *Remp v. Alcon Laboratories, Inc.*, 701 F. App'x 103, 107 (3d Cir. 2017) (non-precedential) (citations omitted) (summarizing other decisions). We will look for a singular action to decide whether an adverse employment action has occurred, rather than aggregating the allegations. *See Homel v. Centennial Sch. Dist.*, 836 F. Supp. 2d 304, 323-24 (E.D. Pa. 2011); *Harris v. Keystone Cement Co.*, 2021 WL 672416, at *8 (E.D. Pa. Feb. 22, 2021).

Even at the pleadings stage, courts are reluctant to conclude an employment action is actually adverse without allegations showing how an employment action significantly changed someone's work conditions. For example, in *Peterkin v. Prospect Airport Services*, an airport employee did not "plead facts allowing [the court] to plausibly infer" the "depriv[ation] . . . of

the potential to earn tips" or reassigning her to a different airport terminal significantly changed her employment status.  2021 WL 2400753, at *16 (E.D. Pa. June 11, 2021).  In dismissing the airport employee's claim, the court said "[t]here [was] insufficient factual content to draw a reasonable inference of an adverse employment action" without any insights into how the lack of tips affected the airport employee's work conditions, or how reassignment to a different airport terminal "affected her pay or other benefit or condition of employment."  *Id.* at *15.

A work evaluation that is critical of an employee's performance is not an adverse employment action if it does not "effect a material change in the terms or conditions of the plaintiff's employment."  *Burton v. Pa. State Police*, 990 F. Supp. 2d 478, 502 (M.D. Pa. 2014), *aff'd*, 612 F. App'x 124 (3d Cir. 2015)).  For example, in *Burton*, the Third Circuit explained that an employee failed to show a "material change" to the terms and conditions of employment where his supervisor issued a "notation" to discipline him.  *Burton*, 612 F. App'x at 127; *see also Friel v. Mnuchin*, 474 F. Supp. 3d 673, 686 (E.D. Pa. 2020) (holding a "performance evaluation did not adversely affect" employee because, among other reasons, "[h]e was not denied a promotion, given significantly different responsibilities, or assigned less work"); *Harris*, 2021 WL 672416, at *9 (rejecting an employee's argument that a "written warning, criticism by [a coworker]," and a poor performance review constituted an adverse employment action without evidence of "a material change in the terms or conditions" of an employee's status).

"[D]erogatory comments" — even if perceived as racially charged — may not constitute an adverse employment action if they do not "illustrate a change in the terms or conditions of . . . employment."  *Wesley v. PNC Bank*, 2020 WL 7319548, at *5 (E.D. Pa. Dec. 11, 2020).  In *Wesley*, a bank teller alleged that her general manager told her "she would be 'better off'

working in an inner city branch" of her bank "because she is African American," when the bank she worked at served predominantly "white conservatives." *Id.* at *4.  The bank teller argued the comment, paired with other "similar racist comments," showed "explicit adverse action" by her employer. *Id.*  The court disagreed, noting that the bank teller failed to allege any sort of adverse employment action following the comments. *Id.* at *5.  Crucially, the bank never actually transferred the teller. *Id.*  The court "condemn[ed] [the general manager's] completely inappropriate comments" but concluded the bank teller did not show an adverse employment action. *Id.*

Dr. Brickhouse has failed to allege an adverse employment action, despite the "not onerous" burden to assert a prima facie case.  She does not allege that the School District fired her, suspended her, altered her salary or benefits, changed her responsibilities as Executive Director, or passed up on promoting her.  Nor do the other employment actions Dr. Brickhouse argues are "adverse" show a significant change in her employment status, benefits, or responsibilities.

Dr. Brickhouse's negative performance evaluations do not qualify either.  We are not persuaded that Dr. Brickhouse's September 21, 2021 meeting with her supervisors and the assignment of a "professional leadership plan" constitutes an adverse employment action because, like the employee in *Burton*, she does not allege they seriously affected her ability to perform her job. *See* DI 7 ¶ 80.

The School District's posting of a job encompassing 95% of Dr. Brickhouse's responsibilities is also insufficient. *See id.* ¶ 97.  Dr. Brickhouse did not lose her job because of the new position; she still works as Executive Director.  Dr. Brickhouse herself alleges that her

supervisors told her the new position "will not interfere" with her work.  *Id.* ¶ 101; *see also*

*Homel v. Centennial Sch. Dist.*, 836 F. Supp. 2d 304, 324 (E.D. Pa. 2011) (explaining that

changing an employee's supervisory authority "may simply be the result of organizational

restructuring or an employer's prerogative to free-up the employee for other work").  The new

position does not appear to have significantly changed any of her responsibilities.

      Nor does Dr. Brickhouse adequately allege that Deputy Berry's habit of communicating

with her direct reports is an adverse employment action.  Even assuming we may aggregate these

instances (which we cannot), Dr. Brickhouse does not allege that Deputy Berry's frequent

contact with her team — but not her — meant she no longer possessed authority she previously

had as Executive Director.  Nor does she allege  she was being "phased out" of her Executive

Director position.  *See Homel*, 836 F. Supp. 2d at 324 (declining to consider a change in

reporting structure as adverse employment action without "evidence of the decision's meaning or

effect").

      Deputy Brooks's "nasty" tone or comments about her sick leave did not lead to a material

change in her employment status.  The allegations about her supervisors' comments are more

ambiguous than those of the bank teller in *Wesley*.  We are not convinced that her supervisors'

conduct during meetings or comments about her sick leave demonstrate an adverse employment

action.

      Finally, there are no allegations showing a significant change in Dr. Brickhouse's

employment status or responsibilities after her supervisors denied her vacation request.  There is

no basis for us to consider it as such.

      We need not address whether an inference of discrimination exists without plausible

allegations showing an adverse employment action.  And taken as a whole, it is fairly clear that

Dr. Brickhouse's opposition asks us to focus on the hostile work environment claim, and does

not confront the School District's argument that no adverse employment action exists.  She

discusses adverse employment actions only within the context of her retaliation claim, which

utilizes a different standard for deciding whether an adverse employment action occurred.  *See*

*infra* Section IV.C.

    For these reasons, we grant the School District's motion to dismiss with respect to Dr.

Brickhouse's race discrimination claim.[9]

> ### B. Dr. Brickhouse proffers just enough allegations allowing us to infer her supervisors subjected her to pervasive conduct because of her race, thus, she states a hostile work environment claim.

    An employee must establish five factors to state a hostile work environment claim:

    (1) that she suffered intentional discrimination because of her race;
    (2) that the discrimination was severe or pervasive;
    (3) that the discrimination detrimentally affected her;
    (4) that the discrimination would detrimentally affect a reasonable person of the same race in that position; and
    (5) the existence of *respondeat superior* liability.

*Davis v. City of Newark*, 285 F. App'x 899, 902 (3d Cir. 2008).  The School District challenges

Dr. Brickhouse's ability to plead prongs one and two of her prima facie case, so we focus our

analysis there.

---

    [9] We are aware that "'[a] complaint need not establish a *prima facie* case in order to survive a motion to dismiss'; it need only allege sufficient facts to *raise a reasonable expectation* that the plaintiff could prove her claims after discovery."  *Stovall v. Grazioli*, 2023 WL 3116439, at *2 n.2 (3d Cir. Apr. 27, 2023) (emphasis added) (quoting *Connelly v. Lane Const. Corp.*, 809 F.3d 780, 788 (3d Cir. 2016)).  But even if we disregard the specific elements of a prima facie race discrimination claim, Dr. Brickhouse has not averred facts stating a plausible claim.

For prong one (intentional discrimination), the Third Circuit has said an employer's conduct need not "overtly implicate racial animus," but "comments that cannot be reasonably construed as invoking any racial feeling do not support Title VII liability." *Davis*, 285 F. App'x at 902 (affirming dismissal of a police officer's claim because, outside of one incident that was "not in and of itself discriminatory," the allegations supporting her hostile work environment claim "simply . . . assert[ed] an event and then assert[ed] that it was motivated by racial bias"); *see also Harper v. Tyco Elecs. Corp.*, 804 F. Supp. 2d 159, 163 (D. Del. 2011) (dismissing hostile work environment claim where "a nexus between [an employer's] conduct and [employee's] race" was missing).

But an employee can overcome the absence of overt discrimination "'by way of comparators,' specifically, by alleging that 'similarly situated persons who are not members of [the employee's] protected class were treated more favorably.'" *Williams v. Aramark Campus LLC*, 2020 WL 1182564, at *5 (E.D. Pa. Mar. 12, 2020) (quoting *Mojica v. Advance Auto Parts, Inc.*, 2016 WL 107844, at *4-5 (E.D. Pa. Jan. 11, 2016). "[F]actors such as the employees' job responsibilities, the supervisors and decision-makers, and the nature of the misconduct engaged in" help determine whether employees are similarly situated. *Wilcher v. Postmaster Gen.*, 441 F. App'x 879, 882 (3d Cir. 2011). Importantly, "[w]hether individuals are similarly situated is a factual question generally left for the jury." *Heredia-Caines v. Lehigh Valley Hosp.*, 580 F. Supp. 3d 114, 126 (E.D. Pa. 2022). But a "fail[ure] to identify relevant comparators, fail[ure] to allege differential treatment for the same conduct, or fail[ure] to show that her treatment was less favorable than that of other employees" militates against showing a similarly situated employee. *Stovall*, 2023 WL 3116439, at *2.

14

Here, lacking allegations of overt discrimination, Dr. Brickhouse bolsters her claim by identifying a similarly situated comparator who was not subject to the same treatment as her: Ms. Moody.  She plausibly alleges that she and Ms. Moody had similar job responsibilities.  They worked on similar tasks together, DI 7 ¶¶ 36, 74, 112, 116, attended some of the same meetings, *id.* ¶¶ 107, and both reported to Deputy Berry, *id.* ¶ 17.

Further, there are sufficient facts showing Dr. Brickhouse was treated less favorably than Ms. Moody.  Ms. Moody received "teacher shortage" information well before she did.  *Id.* ¶ 36. Deputy Berry included Ms. Moody on meetings that she was never invited to.  *Id.* ¶ 107.  Ms. Moody was never exposed to the type of treatment in meetings that Dr. Brickhouse received from Deputy Berry.  *Id.* ¶ 41.  And Ms. Moody did not get the same disciplinary "write-up" that Dr. Brickhouse received after the two worked together on a group project.  *Id.* ¶ 115.

These allegations — supplemented with the fact that a "comparator" analysis is fact-intensive and typically left for a jury — lead us to conclude that Dr. Brickhouse has sufficiently alleged a similarly situated employee to demonstrate intentional discrimination.

For prong two, the Third Circuit has weighed the totality of the circumstances to decide if conduct is "sufficiently severe or pervasive to constitute a hostile work environment."  *Davis*, 285 F. App'x at 902.  The analysis, according to the Supreme Court, is not "a mathematically precise test."  *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 22 (1993).  And the "Third Circuit has been liberal in its treatment of 'pervasive' and 'regular,' especially in light of Rule 8(a) of the Federal Rules of Civil Procedure."  *Dunn v. Bucks Cnty. Cmty. Coll.*, 2014 WL 2158398, at *2 (E.D. Pa. May 22, 2014) (quoting *Gupta v. Sears, Roebuck & Co.*, 2007 WL 2253609, at *5 (W.D. Pa. Aug. 3, 2007)).

We must consider "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris*, 510 U.S. 17 at 23; *see Komis v. Sec'y of U.S. Dep't of Lab.*, 918 F.3d 289, 293-94 (3d Cir. 2019) ("[L]ess severe isolated incidents which would not themselves rise to the level of [discrimination] may, when taken together as part of 'the overall scenario,' evidence [discriminatory] animus, and one severe incident may be enough to create a hostile work environment." (quoting *Jensen v. Potter*, 435 F.3d 444, 450 (3d Cir. 2006))); *Nitkin v. Main Line Health*, 2023 WL 3365186, at*4 (E.D. Pa. May 11, 2023) (reasoning that "seven comments . . . spread out over a span of over three-and-a-half years" were not frequent enough to be considered severe or pervasive).

For example, in *Thompkins v. Mercy Philadelphia Hospital*, a nurse failed to show that her employer engaged in severe or pervasive conduct because she did not allege reprehensible conduct beyond "the ordinary tribulations of the workplace." 2010 WL 3719099, at *4 (quoting *Haqq v. Pa. Dep't of Pub. Welfare*, 2010 WL 1253452, at *9 (E.D. Pa. Mar. 23, 2010)). The nurse, who sued her employer while still a full-time employee, claimed her supervisors "failed to inform [her] of promotion opportunities," gave her "a rating of 'poor'" in a yearly performance review, had two supervisors participate in her performance review meeting when "it was customary that one manager do so," assigned her extra work in retaliation for "her allegations of discrimination," and "report[ed] her to Human Resources after missing work due to a death in the family." *Id.* at *1. The court viewed the nurse's allegations as nothing more than "a poor relationship with her supervisors" and said her supervisors' "actions were [not] physically threatening, frequent, or interfered with [her] ability to perform her job." *Id.* at *3, *4.

16

Further, courts have not treated allegations of discriminatory *statements* as demonstrative of "severe or pervasive" conduct when the allegations are vague.  *See Williams v. Collins*, 2012 WL 6058299, at *4 (E.D. Pa. Dec. 5, 2012) (dismissing hostile work environment claim where an employee "never identified" the "offensive and unwarranted" comments she was subjected to, "and no hint [was] made as to their frequency, duration, and severity"); *Thompkins*, 2010 WL 3719099, at *4 (explaining that, outside of a "vulgar and profane" email from a supervisor where an employee did "not set forth what the email said," the injured employee did not "point[] to . . . discriminatory comments or insults by anyone" to show severe or pervasive conduct).

Here, Dr. Brickhouse's allegations just barely tip the scales in favor of showing pervasive conduct because of the frequency of harassing workplace conduct.  Unlike *Thompkins*, Dr. Brickhouse's supervisors closely monitored her work attendance for months — right after Deputy Berry questioned her sick leave and Dr. Brickhouse filed her formal discrimination complaint.  *See* DI 7 ¶¶ 85, 87, 89, 91, 93.  Her supervisors told other coworkers to purposely leave Dr. Brickhouse out of work-related conversations, *see id.* ¶¶ 86, 114, and at other times, her supervisors simply did not include her, *see id.* ¶¶ 55, 61, 62, 70, 76, 103.  On a multitude of occasions, her supervisors would not respond to her basic work inquiries.  *See id.* ¶¶ 24, 25, 26, 27, 30, 31, 32, 33, 34, 37.  Though the court in *Thompkins* found no pervasive conduct existed with some allegations like Dr. Brickhouse's — for example, negative performance reviews, extra work, and vague, derogatory language used by supervisors — the frequency of conduct distinguishes Dr. Brickhouse's case.  It is plausible that the presently alleged conditions — over the course of an entire year — unreasonably interfered with Dr. Brickhouse's ability to do her job.

17

We hold Dr. Brickhouse sets forth enough well-pleaded facts showing pervasive conduct. As a result, we deny the School District's motion with respect to Dr. Brickhouse's hostile work environment claim.

### C. Dr. Brickhouse states a retaliation claim because she plausibly alleges an adverse employment action taken against her after she filed a discrimination complaint.

Congress prohibits retaliation against employees who "oppose[] any practice made an unlawful employment practice by" Title VII. 42 U.S.C. § 2000e-3(a). A prima facie case of retaliation is comprised of the following elements:

(1) engaging in activity protected by Title VII;
(2) an employer taking an adverse employment action against its employee; and
(3) a causal connection between the protected activity and adverse employment action.

*Kengerski v. Harper*, 6 F.4th 531, 536 (3d Cir. 2021) (cleaned up).

The School District challenges Dr. Brickhouse's ability to show prong two of a prima facie retaliation claim (adverse employment action), so we focus our analysis there.

Retaliation requires an adverse employment action that is "harmful to the point that [it] could well dissuade a reasonable worker from making or supporting a charge of discrimination." *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 57 (2006). Adverse employment actions supporting retaliation claims can be different than actions supporting discrimination claims because correlating a retaliatory action with "employment-related actions would not deter the many forms that effective retaliation can take." *Id.* at 63-64. Thus, "the antiretaliation provision" of Title VII "is not limited to discriminatory actions that affect the terms and conditions of employment." *Id.*; *see also Stovall v. Grazioli*, 2023 WL 3116439, at *3 (3d Cir. Apr. 27, 2023) (holding an employee's disparate treatment and hostile work environment claims

"raise[d] no overt or implicit suggestion that the [employer] treated her differently because of her race," but the employee plausibly alleged an adverse employment action and causation to support a retaliation claim); *Friel v. Mnuchin*, 474 F. Supp. 3d 673, 686 n.56 (E.D. Pa. 2020) ("An action that would dissuade a reasonable employee from engaging in protected activity may not be serious or tangible enough to materially alter the conditions of employment.").

A "sudden increase" in "sick checks" after an employee engages in protected activity under Title VII may constitute an adverse, retaliatory action. *See Moore v. City of Philadelphia*, 461 F.3d 331, 352 (3d Cir. 2006). In *Moore*, a police department conducted sick checks on one of its officers "almost every other day" in the two months following the filing of a lawsuit against the department. *Id.* at 338-39. The police officer "received three sick checks in his first five months of medical leave," as compared to "over 30 sick checks" after he sued. *Id.* at 352. The Third Circuit deemed the frequent sick checks adverse, reasoning that the "striking difference in the application of the sick-check policy before and after the date [the officer] filed his lawsuit would support an inference that it was caused by retaliatory animus." *Id.* at 352. It reversed the district court's grant of summary judgment for the officer's retaliation claim. *Id.*

Further, an employee being disciplined for the first time after filing a formal discrimination complaint raises the inference of an adverse employment action. *See McNeil v. Penn Warehousing & Distrib. Inc.*, 2021 WL 1923008, at *8 (E.D. Pa. May 13, 2021). In *McNeil*, an employee alleged "that before filing complaints with the EEOC," she had never been disciplined by her employer. *Id.* at *2. But after filing her first discrimination charge, she "was issued verbal and written discipline and was called into the office regularly in contemplation of discipline." *Id.* at *8. The employer's disciplinary actions were enough to allege an adverse

employment action when the employee "had never been disciplined" before. *Id.* The fact that the employee filed a second discrimination complaint following the discipline was immaterial; what mattered, according to the court, was whether a "reasonable employee could plausibly be dissuaded" from filing a discrimination complaint under the circumstances. *Id.*

Here, Dr. Brickhouse has plausibly alleged two adverse employment actions after she filed her first discrimination complaint — both supporting her retaliation claim. First, like the police officer in *Moore*, Dr. Brickhouse alleges a noticeable increase in the amount of times her supervisors checked her work attendance after she filed and renewed her race discrimination complaint. DI 7 ¶¶ 85, 87, 89, 91, 93. Second, like the employee in *McNeil*, Dr. Brickhouse received her first ever negative evaluation from her supervisors less than one month after reinstating her formal discrimination complaint. DI 7 ¶¶ 71, 80. While monitoring work attendance and a meeting with her supervisors may not have materially affected Dr. Brickhouse's employment status, it is plausible that a reasonable employee under the circumstances would have been dissuaded from formally complaining to the School District about race discrimination.

Therefore, Dr. Brickhouse alleges an adverse employment action supporting her prima facie retaliation claim, and we deny the School District's motion to dismiss her retaliation cause of action.

### D. Dr. Brickhouse fails to state an ADA claim because she does not allege that Deputy Berry acquired her medical information as part of a medical examination or inquiry.[10]

---

[10] Dr. Brickhouse also dedicates a section of her response to argue her supervisors violated her constitutional right to privacy by disclosing her confidential medical information. *See* DI 10 at 18-20 (citing 42 U.S.C. § 1983). But she does not allege a separate § 1983 cause of action in her amended complaint. We do not analyze her claim for this reason.

Congress allows "covered entit[ies]" to "conduct voluntary medical examinations" or "make inquiries into the ability of an employee to perform job-related functions."  42 U.S.C. § 12112(d)(4)(B).  The covered entity must treat information collected from the exam or inquiry as a "confidential medical record."  *Id.* § 12112(d)(3)(B).  Importantly, the ADA's confidentiality provisions kick in only if the medical information "is obtained during an **employer-requested** medical examination or inquiry."  *Maude v. City of Philadelphia*, 2018 WL 11306950, at *1 n.1 (E.D. Pa. Oct. 25, 2018) (emphasis added).\

We agree with the School District's argument that the ADA's confidentiality protections are not triggered here.  Dr. Brickhouse does not allege that the School District, Deputy Berry, or Dr. Savoy-Brooks inquired at all about her medical condition at the time she took sick leave.  Her disability discrimination claim fails for this reason.[11]

### E. We dismiss Dr. Brickhouse's intentional infliction of emotional distress claim because her allegations do not meet the standard of extremeness and outrageousness for a claim under Pennsylvania law.

A claimant must plausibly allege the following four factors to state an intentional infliction of emotional distress claim:

(1) the conduct of [the] defendant must be intentional or reckless;
(2) the conduct must be extreme and outrageous;
(3) defendant's conduct must cause emotional distress; and
(4) the distress must be severe.

*Mulgrew v. Sears Roebuck & Co*, 868 F. Supp. 98, 103 (E.D. Pa. 1994).  The Third Circuit has

---

[11] And assuming, *arguendo*, that the School District inquired about the reasons for Dr. Brickhouse's sick leave, we are not convinced the inquiry is a "medical inquiry" as defined by the ADA.  *See Sheriff v. State Farm Ins. Co.*, 2013 WL 4084081, at *9 (W.D. Pa. Aug. 13, 2013) (holding medical information disclosed to prospective employers "was not obtained pursuant to a medical examination or inquiry").

said "it is extremely rare to find conduct in the employment context that will rise to the level of outrageousness necessary to provide a basis for recovery for the tort of intentional infliction of emotional distress." *Cox v. Keystone Carbon Co.*, 861 F.2d 390, 395 (3d Cir. 1988).

Here, Deputy Berry's and Dr. Savoy Brooks's conduct do not meet the standard required to state an intentional infliction of emotional distress claim. As the School District illustrates, "[a]lleged racial discrimination alone does not demonstrate the requisite outrageous and extreme conduct necessary to provide intentional infliction of emotional pain and suffering." *Lei Ke v. Drexel Univ.*, 2013 WL 1092661, at *13 (E.D. Pa. Mar. 14, 2013).

Thus, we grant the School District's motion to dismiss for this cause of action.

V.  **Conclusion**

We hold the following:

- **Count I (Title VII race discrimination/hostile work environment)** – Dr. Brickhouse fails to state a plausible claim for race discrimination for the reasons set forth in Section IV.A. We grant the School District's motion *without prejudice* with respect to her race discrimination claim. But Dr. Brickhouse states a plausible Title VII hostile work environment claim for the reasons set forth in Section IV.B. Thus, we deny the School District's motion for Count I with respect to her hostile work environment claim.

- **Count II (Title VII retaliation)** – Dr. Brickhouse states a plausible claim for the reasons set forth in Section IV.C. We deny the School District's motion for Count II.

- **Count III (PHRA race discrimination)** – Dr. Brickhouse fails to state a plausible claim for the reasons set forth in footnote 5 and Section IV.A. We grant the School District's motion *without prejudice* for Count III.

- **<u>Count IV (PHRA retaliation)</u>** – Dr. Brickhouse states a plausible claim for the reasons set forth in footnote 5 and Section IV.C.  We deny the School District's motion for Count IV.

- **<u>Count V (ADA)</u>** – Dr. Brickhouse fails to state a plausible claim for the reasons set forth in Section IV.D.  We grant the School District's motion ***without prejudice*** for Count V.

- **<u>Count VI (§ 1981 race discrimination)</u>** – Dr. Brickhouse fails to state a plausible § 1981 race discrimination claim against Deputy Berry for the reasons set forth in footnote 5 and Section IV.A.  We grant the School District's motion ***without prejudice*** for Count VI.

- **<u>Count VII (§ 1981 retaliation)</u>** – Dr. Brickhouse states a plausible § 1981 retaliation claim against Deputy Berry and Dr. Savoy-Brooks for the reasons set forth in footnote 5 and Section IV.C.  We deny the School District's motion for Count VII.

- **<u>Count VIII (intentional infliction of emotional distress)</u>** – Dr. Brickhouse fails to state a plausible claim for the reasons set forth in Section IV.E.  We grant the School District's motion ***without prejudice*** for Count VIII.