### IN THE UNITED STATES DISTRICT COURT
### FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **DR. CHARLOTTE BRICKHOUSE** | **:** | **CIVIL ACTION** |
| | **:** | |
| **v.** | **:** | **NO.  22-4596** |
| | **:** | |
| **SCHOOL DISTRICT OF** | **:** | |
| **PHILADELPHIA, SONYA BERRY,** | **:** | |
| **DR. MALIKA SAVOY-BROOKS** | **:** | |

## <u>MEMORANDUM</u>

**MURPHY, J.**                                              **March 27, 2024**

      The School District of Philadelphia and two of its employees seek summary judgment in a case brought by Dr. Charlotte Brickhouse — a current School District employee.  Earlier in the case, we dismissed Dr. Brickhouse's race discrimination claim, but allowed discovery for her hostile work environment and retaliation claims.  Now, following discovery, we grant summary judgment in favor of the School District.

      Dr. Brickhouse's hostile work environment claim fails at its first element: intentional discrimination because she is a black woman.  Because the record lacks direct evidence of discrimination, Dr. Brickhouse focuses on proposed comparators — two white colleagues who reported to the same supervisor as she.  But the undisputed evidence shows that, in material part, Dr. Brickhouse and her comparators were subjected to the same — sometimes difficult — environment.  And to the extent there were differences in treatment, they are explained by differences in circumstances between Dr. Brickhouse and her comparators.  We therefore conclude that a reasonable jury cannot infer discrimination from the treatment of Dr. Brickhouse and her comparators.

      We also grant summary judgment on Dr. Brickhouse's retaliation claim because she has no evidence rebutting the School District's legitimate, non-retaliatory reason for treating her the

way it did: her work performance.  Even assuming Dr. Brickhouse can prove her retaliation claim, she lacks evidence sufficient for a reasonable juror to conclude that the School District's performance concerns were disguised discrimination.

Therefore, we grant the School District's motion.

I.      **Facts**[1]

### *Dr. Brickhouse and the OSS leadership team*

Dr. Charlotte Brickhouse, a black woman, has worked for the School District of

Philadelphia for over twenty years.  *See* DI 29-3 ¶¶ 1, 2, 8.  Dr. Brickhouse has specialized

---

[1] The School District leaves us additional (and unnecessary) homework to correctly situate the facts in a sprawling record.  It submitted a statement of undisputed facts, *see* DI 29-3, to which Dr. Brickhouse responded *and* filed a supplemental statement of facts, *see* DI 34-1, 34-2.  But unlike Dr. Brickhouse, the School District did not respond to Dr. Brickhouse's supplemental statement of facts paragraph by paragraph.  *See* DI 41-1.  Instead, the School District filed a general brief that argues Dr. Brickhouse's supplemental statement of facts is "substantially cumulative with" facts already submitted with its motion.  *Id.* at 2.  The School District says that Dr. Brickhouse's supplemental statement of facts relies too heavily on a "self-serving declaration," which — in its view — is vague, conclusory, and fails to demonstrate Dr. Brickhouse's personal knowledge of the events in question.  *See id.* at 3-10; Fed. R. Civ. P. 56(c)(4).

We cannot ignore Dr. Brickhouse's supplemental statement of facts like the School District wants us to.  The School District could have — and should have — responded paragraph by paragraph.  But the School District makes fair points; a skim of Dr. Brickhouse's supplemental statement of facts shows that many supplemental "facts" are duplicative of ones already submitted (and ones Dr. Brickhouse responded to).  Moreover, some "supplemental facts" plainly inject legal conclusions into facts already in the record.

Unlike what the School District seems to think (and decided for itself to do), we do not have the latitude to ignore Rule 56, so we will take the following approach:

- we will use facts submitted by the School District that Dr. Brickhouse does not dispute;
- to the extent a fact is genuinely disputed by Dr. Brickhouse, *see* DI 34-2, we will view the fact in the light most favorable to her;
- to the extent that Dr. Brickhouse submitted a supplemental, material fact, *see* DI 34-1, that the School District failed to specifically respond to, we will treat the fact as undisputed; and
- to the extent that Dr. Brickhouse submitted a supplemental, material fact that substantially overlaps with a fact she already responded to, we will endeavor to cite to both.

Our facts section includes citations to the School District's appendix in support of its motion ("App.").  *See* DI 29-7, 29-8.  We also cite Dr. Brickhouse's supplemental appendix ("Supp. App.").  *See* DI 34-4, 38-2, 38-3.

training from her doctoral program in "urban special education."  DI 34-1 ¶ 114.  She's played different roles with the School District, *see id.* ¶¶ 2-3, but relevant here is her job as Executive Director of Instructional Programming within the School District's Office of Specialized Services (OSS), *see* DI 29-3 ¶ 3.

OSS supports special needs students, *id.* ¶ 4, and is "managed by Chief Academic Supports Officer, . . . Dr. Malika Savoy-Brooks" — a black woman, *id.* ¶¶ 10-11.  Dr. Brickhouse "was a member of OSS's Leadership Team."  *Id.* ¶ 13.  The team consisted of Dr. Brickhouse and three others.  *See id.* ¶ 14; DI 34-1 ¶ 176.

(1) <u>Sonya Berry</u> – an OSS Executive Director until April or May 2021 — when the School District promoted her to "Acting (i.e., interim) Deputy Chief of OSS."  DI 29-3 ¶ 7; *see also id.* ¶¶ 9, 12.  Her promotion became permanent in 2022.  *See* DI 34-1 ¶ 174.  Before her promotion, she and Dr. Brickhouse were "counterparts and peers."  DI 29-3 ¶ 9.  Like Dr. Brickhouse, Deputy Berry is a black woman.  *Id.* ¶ 8.

(2) <u>Tracie-Marie Moody</u> – "the acting and then permanent Executive Director of Field and Support Services."  *Id.* ¶ 16.  When the School District promoted Sonya Berry to Interim Deputy Chief of OSS, it promoted Ms. Moody to Interim Executive Director of Field Support.  Supp. App. 173.  Ms. Moody is a white woman.  *See* DI 29-3 ¶ 17.

(3) <u>Heidi Hertzog</u> – "Special Counsel to OSS."  *Id.*  Ms. Hertzog is a white woman. *See id.* ¶ 19

Dr. Brickhouse, Ms. Moody, and Ms. Hertzog all reported directly to Deputy Berry.  *Id.* ¶ 15; DI 34-1 ¶ 176.

### *The School District's 2021 Extended School Year Program*

As Executive Director of Instructional Programming, Dr. Brickhouse was "the lead coordinator" of the School District's Extended School Year (ESY) summer program.  DI 29-3 ¶ 25.  The ESY program lasts five to six weeks and provides additional education and support for

students. *Id.* ¶ 20.  Dr. Brickhouse designed the program — including "special education programming and instructional frameworks" — and "plann[ed] professional development programming on special-education matters for school administrators." *Id.* ¶ 6.  The program time is "between June 28, 2021 and August 4, 2021." *Id.* ¶ 21.  Ms. Moody and her own team also supported the program. *See* DI 34-1 ¶ 140.

Preparations for the ESY program began in the weeks leading up to June 2021. *See* DI 29-3 ¶¶ 25-28.[2]  Some employees had concerns about program staffing and enrollment because "[a] staff shortage would cause student-teacher ratios to exceed those permitted for special education programs." *Id.* ¶ 24; *see also* Supp. App. 183.  But Dr. Brickhouse never knew School District employees had these concerns. *See* DI 34-2 ¶ 24; DI 34-1 ¶ 12.  And she did not receive the same information about the shortage that Ms. Moody received from Deputy Berry.  DI 34-1 ¶ 27.

Deputy Berry held meetings in anticipation of the ESY program. *See* DI 29-3 ¶ 26.  For one meeting on May 7, Dr. Brickhouse "was unaware of [its] purpose," and it "was never previously discussed with [her]." *Id.* ¶ 27 (cleaned up).[3]  In another meeting on June 17, Dr.

---

[2] Dr. Brickhouse says that she began preparing for ESY 2021 "10 months prior" to its commencement.  DI 34-2 ¶ 23.  She cites to her own declaration as support, but none of cited paragraphs in her declaration say that she began preparing ten months before June 2021. *See* Supp. App. 2-3, 7.

[3] The meeting pertained to the "ordering of materials" for the ESY program.  DI 34-1 ¶ 8.  Dr. Brickhouse texted Deputy Berry about the ordering, but Deputy Berry did not respond. *Id.* ¶ 9.  However, Deputy Berry responded to Dr. Brickhouse's correspondence "about ordering materials" in a May 7 email exchange. *See* DI 41-1 at 8 (citing DI 41-2 at 4-5 (ECF)).

Brickhouse said Deputy Berry acted "nasty" and spoke "in a demeaning manner." *Id.* ¶ 28.[4]

When the ESY program finally started, "Dr. Brickhouse was absent from work on multiple occasions." *Id.* ¶ 32.  Dr. Brickhouse called out sick from June 24 to July 8 due to illness. *See id.* ¶ 33.[5]  She told her direct report, Russell Washington, about her specific illness and ensured coverage in her absence. *Id.* ¶ 34; *see* DI 34-2 ¶ 38.  The Family and Medical Leave Act covered all but one of Dr. Brickhouse's sick days.  *See* DI 29-3 ¶ 33.  Dr. Brickhouse also took a "pre-approved" vacation from July 12-16.  *See id.* ¶ 36; DI 34-2 ¶ 36.  In total, Dr. Brickhouse "missed 15 of the 38 days of ESY."  DI 29-3 ¶ 37; DI 34-2 ¶ 37.

Problems arose during the ESY program.  For example, Deputy Berry expressed concerns over a "shortage of needed school supplies."  *See* DI 29-3 ¶ 31.  No one brought the shortage to Dr. Brickhouse's attention.  DI 34-2 ¶ 31.  Additionally, ESY program students were being bussed to "incorrect school locations."  DI 29-3 ¶ 31.[6]

### Dr. Brickhouse files a personnel complaint.

As the ESY program commenced — while she was out sick — Dr. Brickhouse filed a personnel complaint with the School District.  *See id.* ¶¶ 43, 45.  Ronak Chokshi — "then the Interim Deputy Chief of the School District's Office of Employee and Labor Relations" —

---

[4] Deputy Berry never referred to or talked about Dr. Brickhouse's race during the June 17 meeting.  DI 29-3 ¶ 29.  Nor did she "swear or call Dr. Brickhouse any names."  *Id.* ¶ 28.

[5] While Dr. Brickhouse was absent — on June 24, 2021 — Deputy Berry emailed her a work-related task.  *See* DI 29-3 ¶ 35.  Dr. Brickhouse admits "only that" Deputy Berry "continued harassing" her "while [she] was out on sick leave."  DI 34-2 ¶ 35.  That response does not create a material dispute of fact.

[6] Dr. Brickhouse's responsibilities did not include bussing students to the correct schools.  DI 34-2 ¶ 31; DI 34-1 ¶ 13.

fielded her complaint. *See id.* ¶ 43.[7] Mr. Chokshi spoke to Dr. Brickhouse on the phone about

her complaint for the first time while he attended "an end-of-year celebration in a restaurant."

DI 34-1 ¶ 118.

Soon after their initial call, on July 2, Dr. Brickhouse memorialized her complaint in an

email; she wanted "to file a complaint for defamation of character, a HIPPA [sic] violation[,] and

working in a hostile work environment." App. 0341. Dr. Brickhouse described a conversation

she had with a direct report, where the direct report said that Ms. Moody and "the acting

Deputy," i.e., Deputy Berry, "did not believe that [she] was really sick" during the ESY program.

*Id.* at 0341-42; *see also* DI 34-1 ¶ 42. Dr. Brickhouse voiced her frustration that Ms. Moody

somehow knew about her medical condition despite her not sharing it directly with Ms. Moody.

App. at 0341-42. Dr. Brickhouse detailed the derogatory environment she had been working

in — where her ideas were being "belittled," her mental and physical health were being harmed,

her time was being stretched thin, and her "professional reputation" was being "damag[ed]." *Id.*

Dr. Brickhouse's July 2 email did not specifically name Deputy Berry as the person

subjecting her to the work environment,[8] but her follow-up email a few days later did. *See* DI

34-2 ¶ 48; *see also* App. 0340. While Dr. Brickhouse "did not mention 'race' in [her] email,"

she "did mention [race] in [her phone] conversation with [him]." *See* DI 34-1 ¶ 43 (citing Supp.

App. 8); *see also id.* ¶ 122 ("When [Dr. Brickhouse] complained to Mr. Chokshi that she was

---

[7] The School District's Office of Employee and Labor Relations handles complaints like
Dr. Brickhouse's. DI 29-3 ¶ 44. Mr. Chokshi managed the office. DI 34-1 ¶ 117. Mr. Chokshi
reported to Lirisa Shambaugh, the School District's Chief Talent Officer. *Id.* ¶ 116.

[8] The email referred to the "acting Deputy," which at the time was Deputy Berry.

being subjected to harassment by Deputy Berry, [she] told Mr. Chokshi that Deputy Berry was not subjecting her [white] co-workers to the same treatment.").[9]

Mr. Chokshi summarized Dr. Brickhouse's complaint in a July 5 email to himself.  *See id.* ¶ 133 (citing Supp. App. 148).  But after follow-up correspondence with Mr. Chokshi, *see* DI 29-3 ¶ 49, Dr. Brickhouse rescinded her complaint on July 9, *id.* ¶ 51.  Dr. Brickhouse cited "not want[ing] to involve [her] direct reports in the investigative process" as a reason for rescission.  App. 0345.  Dr. Brickhouse and Mr. Chokshi met on July 21 to talk about her choice.  DI 29-3 ¶ 52.

---

[9] Mr. Chokshi testified that Dr. Brickhouse did not claim that her work environment was hostile because of her race.  *See* DI 29-3 ¶ 50.  Specifically, Mr. Chokshi said that Dr. Brickhouse "did not raise a complaint of harassment or discrimination on the basis of a protected status," thus, his office did not engage in a formal investigation.  App. 0483.  He testified that he "may have told" Dr. Brickhouse that her complaint "*wasn't* a complaint of race or some other protected status."  *Id.* (emphasis added).  And he did not recall asking Dr. Brickhouse what protected status formed the basis of her complaint.  *Id.*

Dr. Brickhouse disputes Mr. Chokshi's testimony by arguing that Mr. Chokshi "tactfully omitted [her] mention that [Deputy] Berry's behavior was racially motivated."  DI 34-2 ¶ 50.  Dr. Brickhouse says that "she communicated" the "hostile and toxic work environment in phone conversations and emails."  *Id.*  Those emails do not mention her race.  *See id.* (citing Supp. App. at 149-52, 156-58, 159-60, 161-62, 166-69).

But when asked at deposition about one of her phone calls with Mr. Chokshi, she testified:

> I shared with [Mr. Chokshi] that I was being targeted and *I'm pretty sure that the treatment was because of my race, because [Deputy Berry] was treating [Ms. Moody] and [Ms. Hertzog] differently*.  That was the first time that I directly said to [Mr. Chokshi] that it was because of my race.

Supp. App. 085 (emphasis added).  We must accept as true Dr. Brickhouse's firsthand recitation of the events in question.  *See* Fed. R. Civ. P. 56(c)(4).

8

***Dr. Brickhouse reinstates her complaint and gets a leadership goals memo.***

"Less than six weeks later, on August 30, 2021," Dr. Brickhouse reinstated her personnel complaint.  DI 29-3 ¶ 53; *see* DI 34-1 ¶ 136.  Several work-related incidents had occurred from the time Dr. Brickhouse rescinded her complaint to around the time she reinstated it.[10]  So Dr.

---

[10] The incidents are tough to organize, and some incidents overlap with conduct outside of the "post-rescission, pre-reinstatement" timeframe.  *See, e.g.*, DI 34-1 ¶ 67 (Deputy Berry failing to respond to Dr. Brickhouse on August 31, 2021 — one day after Dr. Brickhouse reinstated her complaint).  Here are some.

- "[I]n the late summer and early fall of 2021, Dr. Brickhouse was tasked with planning and facilitating special education professional development sessions."  DI 29-3 ¶ 40.  The School District received complaints from program attendees about the quality of their office's presentations.  *See id.* ¶ 41.  But Dr. Brickhouse "never received negative complaints regarding professional development" and attributed some issues in executing the developmental sessions to Ms. Moody and Ms. Hertzog.  *See* DI 34-2 ¶ 41.

- Deputy Berry "met or spoke with Dr. Brickhouse's direct reports on ten occasions" from May through November 2021.  DI 29-3 ¶ 75; *see also id.* ¶¶ 79-84; DI 34-2 ¶¶ 79-84.  Dr. Brickhouse disputes the majority of these facts as they are "stated"; in response, she cites her own declaration.

- Deputy Berry scheduled meetings without Dr. Brickhouse's input or having her in attendance.  *See, e.g.*, DI 29-3 ¶¶ 75, 79, 83-84.

- Deputy Berry spoke to Mr. Washington — Dr. Brickhouse's direct report — six times "between late July 2021 and late August 2021 . . . without Dr. Brickhouse's participation or advance notice."  *Id.* ¶ 76; *see also* DI 34-1 ¶¶ 56-57, 64.  Mr. Washington thought Dr. Brickhouse should have attended some of the meetings.  *See* DI 34-2 ¶ 77.

- Deputy Berry did not respond to several of Dr. Brickhouse's "text messages, emails, and meeting requests."  DI 29-3 ¶ 73; *see also* DI 34-1 ¶¶ 47, 49-53, 55.  The parties dispute the number of messages sent without a response, but Dr. Brickhouse does not dispute that she and Deputy Berry sent each other "several thousand emails" in their working relationship.  DI 29-3 ¶ 72 n.5.

9

Brickhouse met with Mr. Chokshi on September 10 and explained her "inten[tion] to coordinate a conversation with [Deputy] Berry . . . to resolve their issues." DI 29-3 ¶ 53.[11]   At the time, Dr. Brickhouse had been "performing the duties of two positions, as a director, and also as Executive Director."  DI 34-2 ¶ 57.

On September 13, and after meeting with Dr. Brickhouse, Mr. Chokshi met with his supervisor — Lirisa Schambaugh.  *See* DI 34-2 ¶ 92.  Mr. Chokshi's meeting notes include two bullets: "Ask SB [Sonya Berry] to meet with CB [Charlotte Brickhouse]"; and "LS [Lirisa Schambaugh] will talk to Malika [Dr. Brooks]."  Supp. App. 287.  At some point after Mr. Chokshi's meeting, Dr. Brooks and Deputy Berry "were made aware that a complaint was made by Dr. Brickhouse."  DI 34-2 ¶ 92.  On September 15, just two days later, Dr. Brooks shared a meeting invitation with Dr. Brickhouse and Deputy Berry titled, "Leadership Expectation."  *See* DI 34-1 ¶ 128 (citing Supp. App. 288); *see also* DI 34-2 ¶ 92.[12]

---

[11] *See also* App. 0349 ("CB [Charlotte Brickhouse] will let RC [Ronak Chokshi] know on Week of 9/13, after speaking with coach, what she wants to do.  She may ask coach to make another request for [mediated]/facilitated conversation with SB [Sonya Berry].").  Dr. Brickhouse says that she met with Mr. Chokshi about her complaints on September 8, 2021.  *See* DI 34-1 ¶ 73.  Dr. Brickhouse's leadership coach would mediate the conversation.  *Id.*; *see id.* ¶ 54.  But the meeting did not happen because Dr. Brickhouse's leadership coach was unavailable.  *See* DI 34-2 ¶ 55; DI 34-1 ¶ 137.

[12] The School District scrutinizes Dr. Brickhouse's counterstatement of fact.  *See* DI 41 at 10 n.5.  It cites to Deputy Berry's and Dr. Brooks's deposition testimony, where they testified that they did not know about Dr. Brickhouse's hostile work environment complaint by September 2021.  *See id.*  The School District further argues that Mr. Chokshi's meeting notes do not conclusively confirm that Deputy Berry or Dr. Brooks ever found out about Dr. Brickhouse's personnel complaint from either Mr. Chokshi or Ms. Schambaugh.  *See id.*
Accepting Dr. Brickhouse's version of events as true, which we must, we can reasonably infer that Dr. Brooks and Deputy Berry found out about Dr. Brickhouse's personnel complaint prior to circulating a meeting invitation on September 15.

The meeting invitation surprised Dr. Brickhouse, as Dr. Brooks had not vocalized any concerns about Dr. Brickhouse's work performance until then.  *See* DI 34-1 ¶ 169.  And one week later, on September 21, Dr. Brooks "met with Dr. Brickhouse and Deputy Berry to address leadership expectations for Dr. Brickhouse."  DI 29-3 ¶ 59.  Dr. Brooks wanted "to remediate Dr. Brickhouse's performance issues."  *Id.* ¶ 56; *see also id.* ¶¶ 57-58 (stating that one of Dr. Brooks's direct reports had requested that Dr. Brooks offer Dr. Brickhouse additional support).[13]

At the September 21 meeting, Dr. Brickhouse received a "Leadership Goals Memo."  *Id.* ¶ 59; *see* App. 0263-71.  The memo listed Dr. Brickhouse's strengths and areas of improvement. DI 29-3 ¶ 61; App. 0263.  Mentioned in the "areas of growth" section was the ESY program. App. 0263.  Dr. Brooks asked Dr. Brickhouse to "create goals and two action items for her work, team, and leadership" as follow-up.  *See* DI 34-2 ¶ 62.  And during the meeting, "Dr. Brooks told [Dr. Brickhouse] that she considered terminating [her] employment from the School District." *Id.* ¶ 58; *see also* Supp. App. 56.

The School District did not place the memo in Dr. Brickhouse's personnel file.  *See* DI 29-3 ¶ 65.[14]  Nor did the School District use the leadership memo as a "form of corrective action

_____

[13] Dr. Brickhouse disputes Dr. Brooks's position with legal conclusions and assertions without support in the record.  *See* DI 34-2 ¶ 56 (arguing "Dr. Brooks participated in the retaliatory harassment and retaliatory actions against Dr. Brickhouse," that Dr. Brickhouse in fact had no "performance issues," and that Dr. Brickhouse's white colleagues were subjected to different treatment that did not include an "unwarranted performance improvement plan").

And though Dr. Brickhouse does not dispute that Dr. Brooks's direct report was aware of Dr. Brickhouse's strenuous work responsibilities, she says that Dr. Brooks's direct report "had no oversight" over her work.  *Id.* ¶ 57.

[14] Dr. Brickhouse disputes the School District's fact in one word ("Disputed") and cites to only her declaration as support.  DI 34-2 ¶ 65 (citing Supp. App. 16).  Setting aside the legal

or discipline." *Id.*[15]

### *Meeting and memo fallout*

After the September 21 meeting, Dr. Brickhouse contacted Mr. Chokshi and showed him

the memo she received. *Id.* ¶ 66; DI 34-1 ¶ 125.[16]  Dr. Brickhouse disagreed with the memo's

"allegations" — telling Mr. Chokshi "that [Deputy] Berry had never spoken to [her] previously

about the alleged areas of growth."  DI 34-1 ¶ 79.  The September 21 meeting started a stretch of

once-per-month meetings between Dr. Brickhouse, Deputy Berry, and Dr. Brooks — all of

which Dr. Brickhouse felt were unnecessary.  *See* DI 29-3 ¶¶ 63, 67-68; *see also* DI 34-2 ¶¶ 63,

67; DI 34-1 ¶ 77.  The meetings continued until spring 2022.  DI 29-3 ¶ 67.

Dr. Brickhouse's communications with Mr. Chokshi about her work environment

---

conclusions infused in her declaration, Dr. Brickhouse swears that "[Deputy] Berry had never
discussed or expressed concerns about [her] performance prior to September 21, 2021," and
"[t]he performance document *was placed in [her] personnel records*."  Supp. App. 16 (emphasis
added).  Yet, Dr. Brickhouse gave a different answer at her deposition regarding whether the
leadership memo was placed in her personnel file.  *See* DI 41-1 at 9-10 (citing Dr. Brickhouse's
deposition testimony) ("Q. Did this memo become part of your personnel file?  *A. I don't know.
I didn't even have access to this document other than view access, so I don't know*. . . .  Q. And
this memo wasn't placed in your personnel file, was it?  *A. I don't know. I never had access to
my personnel file*." (emphasis added)); *see also Daubert v. NRA Grp., LLC*, 861 F.3d 382, 391
(3d Cir. 2017) ("When a nonmovant's affidavit *contradicts earlier deposition testimony* without
a satisfactory or plausible explanation, a district court may disregard it at summary judgment in
deciding if a genuine, material factual dispute exists." (emphasis added)).
     Therefore, Dr. Brickhouse's declaration does not create a genuine dispute of material fact
regarding whether the School District placed the memo in her personnel file.

     [15] Dr. Brickhouse relies on her declaration to dispute whether the leadership memo was a
form of corrective action or discipline.  Supp. App. 16.  Construing the disputed fact and drawing
inferences in her favor, the most she can say is that the meeting and memo "confirm[]" her
supervisors "race discriminatory and retaliatory practices" against her and "were a form of
retaliatory harassment."  *Id.*  Those are legal arguments and conclusions, not facts.

     [16] Dr. Brickhouse did not bring up her race to Mr. Chokshi in her follow-up
correspondence.  *See* DI 29-3 ¶ 66.

continued as well.  *See* DI 34-1 ¶ 83; DI 29-3 ¶ 87.  For example, Dr. Brickhouse forwarded to

Mr. Chokshi an October 7, 2021 email and attachment that she received from Deputy Berry.

App. 0397-98.  The attachment said Dr. Brickhouse improperly "negotiate[d] rates with" a

School District vendor "without prior written approval from the Deputy, Specialized Services."

App. 0398.   Dr. Brickhouse cited the correspondence as "another example of the harassment"

that Deputy Berry subjected her to.  App. 0397.  The School District did not place Deputy

Berry's October 7 memo in Dr. Brickhouse's personnel file.  DI 29-3 ¶ 89.[17]

### *Dr. Brickhouse files an EEOC charge, and her work environment persists.*

Almost two months after her September 21 meeting, Dr. Brickhouse formally complained

about Deputy Berry and Dr. Brooks to the Equal Employment Opportunity Commission

(EEOC).  *See id.* ¶ 90.[18]  Her EEOC complaint recounted some of the events that precipitated her

personnel complaint.  *See* App. 0363-68.  And she later amended her EEOC charge on February

28, 2022 — claiming Deputy Berry and Dr. Brooks retaliated against her for filing the charge in

the first place.  *See* DI 29-3 ¶ 94.

The conduct that Dr. Brickhouse perceived as hostile and retaliatory continued after she

filed her EEOC complaint.  For example:

- In the two years following the filing of her EEOC complaint, Dr. Brickhouse
  received *two* "written memos regarding missed deadlines or work assignments."

---

[17] Again, Dr. Brickhouse relies only on her declaration to dispute this material fact.  *See* DI 34-2 ¶ 89 (citing Supp. App. 17).  But the declaration contradicts her deposition testimony that she never had access to her personnel file.

[18] There are more workplace occurrences — similar to the ones leading to Dr. Brickhouse's personnel complaint — that transpired in the weeks between the September 21 meeting and Dr. Brickhouse's EEOC complaint.  *See, e.g.*, DI 34-1 ¶¶ 80, 84-88.

*Id.* ¶ 102.

o *The first* pertained to "Notices of Recommended Educational Placement" (NOREPs) that Deputy Berry asked Dr. Brickhouse to prepare. *Id.* ¶ 103. Dr. Brickhouse "overs[aw] the NOREP project" with Ms. Moody. DI 34-2 ¶ 104. In a memo, Deputy Berry said Dr. Brickhouse failed to meet deadlines for NOREP completion. App. 0283-85. The deadlines had been extended multiple times for Dr. Brickhouse. DI 29-3 ¶ 104. Deputy Berry's memo was placed in Dr. Brickhouse's "Employee File." DI 34-2 ¶ 105.[19]

o *The second* pertained to Dr. Brickhouse's absence at a meeting scheduled with Dr. Brooks. DI 34-2 ¶ 106. Dr. Brooks sent Dr. Brickhouse a memo stating that she "expect[ed] to be notified by [her] in advance of the meeting" if she could not attend. App. 0282. Dr. Brickhouse met with Dr. Brooks after the meeting and explained that missing the meeting was an oversight and for personal reasons. *See* DI 34-2 ¶ 106. Dr. Brooks's memo was not placed in Dr. Brickhouse's personnel file. *See* DI 29-3 ¶ 107.[20]

• Dr. Brickhouse had some of her vacation requests flat-out denied or approved with delays. *See, e.g.*, DI 29-3 ¶ 97; DI 34-2 ¶ 97.

• Deputy Berry met with Dr. Brickhouse's direct reports on eight occasions in the sixteen months following her EEOC complaint. DI 29-3 ¶ 119.

• The School District posted a job opening for "another Executive Director position" within the OSS "to support with professional development." DI 29-3 ¶ 109. Typically, the OSS had three executive directors. *Id.* ¶ 110. At the time, the OSS had only two: Ms. Moody and Dr. Brickhouse. *Id.* ¶ 111. Dr. Brooks told Dr. Brickhouse that hiring another executive director "will not interfere with [her] job responsibilities." DI 34-1 ¶ 97; DI 29-3 ¶ 112. The School District removed the job posting and never filled the position, *see* DI 29-3 ¶ 114, but

---

[19] The School District says (i) it did not place the memo in Dr. Brickhouse's personnel file, and (ii) the memo did not constitute formal discipline against Dr. Brickhouse. DI 29-3 ¶ 105. But the memo's first page reads that a copy was sent to "Employee File," and a reasonable inference from the face of the memo is that it went into Dr. Brickhouse's employee file.

[20] Unlike the June 7, 2022 memo, Dr. Brickhouse reverts back to her method of generating a disputed, material fact by citing her declaration. But the declaration contradicts her deposition testimony regarding her visibility to her personnel file.

Yasir Roundtree assumed some of the job's responsibilities, *see* DI 34-2 ¶ 114.

o In late September 2022, Dr. Brooks met with Dr. Brickhouse to discuss the role Mr. Roundtree had in supporting OSS.  DI 29-3 ¶¶ 139-41; DI 34-2 ¶¶ 139-41.  Dr. Brooks told Dr. Brickhouse that Mr. Roundtree "would take care of" certain tasks originally assigned to Dr. Brickhouse.  *See* DI 29-3 ¶ 140.  The School District moved four of Dr. Brickhouse's team members to work with Mr. Roundtree.  *Id.* ¶ 141.

• Deputy Berry assigned Dr. Brickhouse responsibilities at a ramshackle school building within the School District.  *See id.* ¶¶ 115-16; DI 34-2 ¶¶ 115-16.

• Deputy Berry asked Dr. Brickhouse in a "nasty" tone to dismiss Mr. Washington from her office during a virtual OSS leadership team meeting.  *See* DI 29-3 ¶¶ 129-30; DI 34-2 ¶¶ 129-30; DI 34-1 ¶ 158.

### *Dr. Brickhouse's comparators*

Dr. Brickhouse, Ms. Moody, and Ms. Hertzog all directly reported to Deputy Berry.  DI 29-3 ¶ 15.  The three expressed similar sentiments about their workplace relationship with Deputy Berry, and how Deputy Berry treated them.[21]  At points, Dr. Brickhouse discussed her feelings about Deputy Berry's treatment with Ms. Moody directly, who commiserated with Dr.

---

[21] *See, e.g.*, DI 29-3 ¶ 28 (Dr. Brickhouse characterizing Deputy Berry as "condescending" and "nasty" in a meeting); *id.* ¶ 143 (Ms. Moody testifying that her relationship with Deputy Berry was "rocky"); *id.* (Ms. Moody testifying regarding Deputy Berry's "tone of voice" and "demeanor"); *id.* ¶ 147 (Ms. Moody's text message to Dr. Brickhouse describing Deputy Berry as "nasty"); *id.* ¶ 148 (Ms. Moody testifying that Deputy Berry commented on her failure to "meet certain expectations of hers"); *id.* ¶ 150 (Ms. Moody referring to Deputy Berry as "nasty"); *id.* ¶ 154 (Ms. Hertzog testifying that Deputy Berry yelled and raised her voice to her).

Dr. Brickhouse disputes Deputy Berry's conduct towards the rest of the OSS leadership team.  *See* DI 34-2 ¶¶ 143-54.  But Dr. Brickhouse's way of disputing the facts is through her own perception of how Ms. Moody and Ms. Hertzog interacted with Deputy Berry — described in the negative.  *See, e.g., id.* ¶ 143 ("Dr. Brickhouse never witnessed a rocky relationship between Ms. Moody and [Deputy] Berry."); *id.* ¶ 144 ("Dr. Brickhouse never witnessed [Deputy] Berry interrupt Ms. Moody in meetings.").  Even if we give full credit to Dr. Brickhouse's perceptions, it fails to contradict what the comparators said.

Brickhouse.  *See, e.g.*, *id.* ¶¶ 146-47, 149-50, 152.  For example, after a June 23, 2022 meeting with Deputy Berry, Ms. Moody texted Dr. Brickhouse that Deputy Berry "had been 'nasty as can be,'" to which Dr. Brickhouse replied, "[n]astiness isn't going to change the facts!"  *Id.* ¶ 147.  And on June 30, 2022, Ms. Moody shared a screenshot with Dr. Brickhouse of messages between her and Deputy Berry, to which Dr. Brickhouse replied in part, "Just nasty!"  *Id.* ¶¶ 149-50; *see also id.* ¶¶ 151-52.[22]

Deputy Berry also critiqued Ms. Moody's work performance — as she did to Dr. Brickhouse.  *See id.* ¶ 148.[23]  While Ms. Moody "never had a performance improvement plan or leadership expectation goals issued to her" by her supervisors, DI 34-1 ¶ 147, 167,[24] she received written communications from Deputy Berry critiquing her work product, DI 29-3 ¶ 148.  Ms. Moody referred to Deputy Berry's informal work feedback as "nasty grams."  DI 29-3 ¶ 148.  And while Ms. Moody never had "leadership expectation goals meetings" with Dr. Brooks, DI 34-1 ¶ 147, she had "one-to-two meeting[s] with [Dr.] Brooks and [Deputy] Berry where they discussed performance issues," Supp. App. 177-78.[25]

---

[22] Dr. Brickhouse never told Ms. Moody that she felt like Deputy Berry treated her differently because of her race.  DI 29-3 ¶ 153.

[23] Dr. Brickhouse tries to create a disputed fact by stating Ms. Moody told her that she never received a write-up from Deputy Berry regarding her work performance.  DI 34-2 ¶ 148; *see also* DI 34-1 ¶ 141.  Her counterstatement does not create a dispute of material fact because the fact that Ms. Moody never told Dr. Brickhouse does not mean Deputy Berry never criticized Ms. Moody's work performance.

[24] *See also* DI 34-1 ¶¶ 108-09 (Ms. Moody never received a write-up from Deputy Berry in June 2022, unlike Dr. Brickhouse); ¶¶ 140-41 (stating Ms. Moody never received a "write up" from her supervisors regarding the ESY program, despite her participation).

[25] Relatedly, and unlike Dr. Brickhouse, Deputy Berry met with Ms. Moody for long one-

## II.        <u>The School District's Motion</u>

The School District[26] moved for summary judgment on Dr. Brickhouse's two remaining

Title VII claims: hostile work environment and retaliation.  *See generally* DI 29-2.[27]  It seeks

judgment as a matter of law on Dr. Brickhouse's hostile work environment claim for two

reasons.  *See id.* at 3.  First, it argues that Dr. Brickhouse has no direct or circumstantial evidence

of intentional discrimination against her because she is black.  *See id.* at 3-10.  In particular, the

School District argues that Dr. Brickhouse's comparator argument is foreclosed by the

uncontradicted evidence showing Ms. Moody and Ms. Hertzog endured similar workplace

treatment from Deputy Berry.  *See id.* at 6-8.  Second, the School District argues that neither

Deputy Berry nor Dr. Brooks subjected Dr. Brickhouse to the legally required severe or

pervasive conduct.  *See id.* at 10-16.

For Dr. Brickhouse's retaliation claim, the School District advances two arguments —

one attacking Dr. Brickhouse's prima facie case, *see id.* at 17-22, and the other challenging Dr.

Brickhouse's claim under the third prong of the *McDonnell Douglas*[28] burden-shifting

---

on-one meetings.  *See, e.g.*, DI 34-1 ¶¶ 18, 139.

[26] Deputy Berry and Dr. Brooks are included in our reference to the School District.

[27] We include Counts IV (retaliation under the Pennsylvania Human Relations Act) and VII (retaliation under 42 U.S.C. § 1981) in our discussion of Dr. Brickhouse's main causes of action because they are analyzed under the same framework.  *See Jones v. Sch. Dist. of Phila.*, 198 F.3d 403, 410 (3d Cir. 1999).  The two Title VII claims survived our decision on the School District's motion to dismiss.  *See* DI 19.  We dismissed Dr. Brickhouse's race discrimination claim because she did not allege a plausible adverse employment action.  *See id.* at 11.  We explained that an adverse employment action sufficient to support a race discrimination claim "can be different" than one supportive of a retaliation claim.  *Id.* at 18.

[28] *McDonnell Douglas v. Green*, 411 U.S. 792 (1973).

framework, *see id.* at 22-23.  For her prima facie case, the School District argues that Dr. Brickhouse's initial personnel complaint is not a "protected activity" under Title VII.  *Id.* at 21-22.[29]  Next, it argues that her supervisors did not take an adverse employment action against her after she engaged in any protected activity.  *Id.* at 17-19.  Finally, the School District says there is no causal connection between any protected activity and an adverse employment action.  *Id.* at 19-21.

Applying *McDonnell Douglas*, the School District posits that Dr. Brickhouse failed to demonstrate that the legitimate, non-discriminatory reason for the conduct she was subjected to — performance concerns — was pretext for race discrimination.  *See id.* at 22-23.  The School District maintains that the "most" Dr. Brickhouse can argue is that she "personally disagreed" with evaluations of her work performance.  *See id.* at 23.

Dr. Brickhouse's response largely regurgitates the facts included in the statements and counterstatements of facts.  She argues that she has "presented substantial evidence" of differential treatment between Dr. Brickhouse and her white comparators.  DI 34 at 9.  This circumstantial evidence, in her view, is enough at summary judgment to show that she suffered discrimination because of her race.  *Id.*  And Dr. Brickhouse argues that the pervasiveness of Deputy Berry's conduct altered the conditions of her work.  *Id.* at 8.

Further, Dr. Brickhouse argues that both her personnel complaint with the School District and her formal EEOC charge are Title VII protected activities.  *Id.* at 12.  She lists thirteen different actions that she says are adverse employment actions under Title VII.  *Id.* at 15.  And

---

[29] The School District admits Dr. Brickhouse's EEOC complaint is a "protected activity."

she argues that a jury should decide whether the actions taken by the School District "could link" to either of Dr. Brickhouse's protected activities. *Id.* at 16.  Moreover, she propounds several actions that she believes disprove the School District's apparent concerns over her work performance. *Id.* at 18-19.

        We have subject-matter jurisdiction over Dr. Brickhouse's causes of action. *See* 28 U.S.C. §§ 1331, 1367.  We held oral argument on the School District's summary judgment motion. *See* DI 50.[30]  The motion is ripe for disposition.  For the following reasons, we grant the School District's motion.

## III.   <u>Standard of Review</u>

        We must "grant summary judgment if [a] movant shows that there is no genuine dispute of material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "Genuine issues of material fact refer to any reasonable disagreement over an outcome-determinative fact." *In re Energy Future Holdings Corp.*, 900 F.3d 728, 737 (3d Cir. 2021). "We must 'view the record and draw inferences in a light most favorable to the non-moving party,' and ask if 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Mervilus v. Union County*, 73 F.4th 185, 193 (3d Cir. 2023) (citation omitted) (first quoting *In re IKON Off. Solns., Inc.*, 277 F.3d 658, 666 (3d Cir. 2022); then quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

        But "[a]lthough we view all facts in the light most favorable to a plaintiff opposing summary judgment and draw all reasonable inference[s] in that party's favor, a plaintiff who

---

[30] Because of the sizable number of facts (and purportedly disputed facts), we issued an order before oral argument to try to help focus the arguments. *See* DI 48.

reaches the summary judgment stage may no longer 'rest upon the mere allegations or denials in his pleadings.'" *Nitkin v. Main Line Health*, 67 F.4th 565, 571 (3d Cir. 2023) (quoting *D.E. v. Cent. Dauphin Sch. Dist.*, 765 F.3d 260, 268 (3d Cir. 2014)). Rather, "the nonmoving party must counter with 'specific facts showing that there is a genuine issue for trial.'" *Campo v. Mid-Atl. Packaging Specialties, LLC*, 564 F. Supp. 3d 362, 379 (E.D. Pa. 2021) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

## IV.    <u>Analysis</u>

### A.    Dr. Brickhouse fails to adduce evidence showing that her supervisors intentionally discriminated against her because of her race.

"An unpleasant work environment is not a good thing, but it is not necessarily actionable, either. Title VII is violated only '[w]hen the workplace is permeated with discriminatory intimidation, ridicule, and insult . . . that is sufficiently severe or pervasive to . . . create an abusive work environment.'" *Burgess v. Dollar Tree Stores, Inc.*, 642 F. App'x 152, 155 (3d Cir. 2016) (alteration in original) (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993)). "[W]hether an environment is 'hostile' or 'abusive' can be determined only by looking at all the circumstances." *Harris*, 510 U.S. at 23.

"To establish a hostile work environment claim under Title VII, a plaintiff must demonstrate that"

(1)    the employee suffered intentional discrimination because of his/her [race],
(2)    the discrimination was severe or pervasive,
(3)    the discrimination detrimentally affected the plaintiff,
(4)    the discrimination would detrimentally affect a reasonable person in like circumstances, and
(5)    [there was] *respondeat superior* liability.

*Nitkin*, 67 F.4th at 570 (alteration in original) (quoting *Mandel v. M&Q Packaging Corp.*, 706

F.3d 157, 167 (3d Cir. 2013)).

The School District argues that there is no genuine dispute of material fact as to elements one and two of Dr. Brickhouse's claim.  We agree with the School District on element one, so we need not address element two.

To prove intentional discrimination, the Third Circuit has "never required a plaintiff to demonstrate direct proof that her harasser's intent was to create a discriminatory environment." *Abramson v. William Paterson Coll. of N.J.*, 260 F.3d 265, 278 (3d Cir. 2001).  Rather, "[t]he proper inquiry at" summary judgment is "whether a reasonable factfinder could view the evidence as showing that [the employee's] treatment was attributable to her [race]." *Id.* at 277. Evidence may be "comparative evidence" that juxtaposes the treatment of the plaintiff with *similarly situated* employees not of the same protected class.  *See Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 80-81 (1998).

Similarly situated means that comparator employees are "similarly situated in all relevant respects." *Wilcher v. Postmaster Gen.*, 441 F. App'x 879, 882 (3d Cir. 2011).  Normally, that determination "takes into account factors such as the employees' job responsibilities, the supervisors and decision-makers, and the nature of the misconduct engaged in." *Id.*  "Which factors are relevant is determined by the context of each case, but often includes a 'showing that the two employees dealt with the same supervisor, were subject to the same standards, and had engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them.'"  *Opsatnik v. Norfolk S. Corp.*, 335 F. App'x 220, 223 (3d Cir. 2009) (quoting *Radue v. Kimberly-Clark Corp.*, 219 F.3d 612, 617-18 (7th Cir. 2000)).  Or it may "involve[] showing that the comparators were 'involved in

acts . . . of comparable seriousness to' the plaintiff's acts." *Collins v. Kimberly-Clark Pa., LLC*, 708 F. App'x 48, 52 (3d Cir. 2017) (alteration in original) (quoting *McDonnell Douglas*, 411 U.S. at 804). And though the question of whether employees are similarly situated "is a factual question generally left for the jury," *Heredia-Caines v. Lehigh Valley Hosp., Inc.*, 580 F. Supp. 3d 114, 126 (E.D. Pa. 2022), "a court may . . . grant summary judgment if no reasonable jury could find that the individuals identified by the plaintiffs were similarly situated," *Hampshire v. Bard*, 793 F. App'x 75, 80 (3d Cir. 2019).

Dr. Brickhouse admitted at oral argument that she does not have direct evidence of intentional discrimination. The record reflects as much. Instead, she relies upon her proposed white comparator: Ms. Moody.[31] Therefore, we must decide whether a reasonable jury can conclude that Ms. Moody is similarly situated to Dr. Brickhouse in all relevant respects, such that intentional discrimination can be inferred from the difference in treatment.

No reasonable factfinder can conclude that Ms. Moody was situated similarly to Dr. Brickhouse, yet treated differently. For starters, there is evidence showing that Deputy Berry treated Dr. Brickhouse and Ms. Moody similarly. *See Warfield v. SEPTA*, 460 F. App'x 127, 130 (3d Cir. 2012) ("In addition to identifying 'similarly situated' individuals, a plaintiff must demonstrate that these individuals were treated more favorably."). Dr. Brickhouse and Ms. Moody both expressed negative feelings regarding Deputy Berry's demeanor towards them. *See supra* at 15 n.21. Dr. Brickhouse shared her feelings about Deputy Berry's work behavior

---

[31] Dr. Brickhouse also argues that Ms. Hertzog is a similarly situated comparator, but a cursory review of her own opposition and statements of facts reflects that she is almost entirely focused on Ms. Moody.

directly with Ms. Moody, who reciprocated them.  DI 29-3 ¶¶ 147, 149-52.  Like Dr. Brickhouse,

Ms. Moody had her work performance criticized.  *See id.* ¶ 148.  Ms. Moody participated in

"one-to-two" meetings with Deputy Berry and Dr. Brooks, just as Dr. Brickhouse did.  *See* Supp.

App. 177-78.  And Ms. Moody even used the same adjective (nasty) that Dr. Brickhouse used to

describe Deputy Berry's demeanor towards her in a meeting prior to the start of the ESY

program.  *Compare, e.g.*, DI 29-3 ¶ 147 ("Ms. Moody complained that [Deputy] Berry had been

'nasty as can be'"), *with* DI 34-2 ¶ 28 ("[Deputy] Berry spoke to [Dr. Brickhouse] in a

'condescending' and 'nasty' tone"); *see Davis v. City of Newark*, 285 F. App'x 899, 902 (3d Cir.

2008) ("[C]omments that cannot be reasonably construed as invoking any racial feeling do not

support Title VII liability.").  In sum, there is very little evidence that Deputy Berry subjected

Dr. Brickhouse — but not Ms. Moody — to a hostile work environment.  That, in turn, weakens

any inference of race discrimination.

　　　　Further, the undisputed concerns regarding Dr. Brickhouse's job responsibilities and

work performance compellingly explain the difference in treatment between Dr. Brickhouse and

Ms. Moody.  *See* DI 29-2 at 8.  Take first, for example, the 2021 ESY program and the events

leading up to Dr. Brickhouse's personnel complaint, which are at the heart of this case.  Unlike

Ms. Moody, Dr. Brickhouse was lead coordinator and designer of the ESY program.  *Compare*

DI 29-3 ¶¶ 6, 25, *with* DI 34-1 ¶ 140 (stating Ms. Moody "participated" and helped support the

ESY program).  When issues arose in preparation for and during the ESY program — for which

Dr. Brickhouse was absent 40% of the time — it inevitably affected her in her lead position.

And Dr. Brooks chose to address those performance-related concerns.  *See* DI 29-3 ¶ 56.  In fact,

the September 2021 leadership goals memo that Dr. Brickhouse argues is demonstrative of

unfavorable treatment explicitly raises the ESY program as an "area[] of growth."  App. 0263.

Second, Dr. Brickhouse "plann[ed] and facilitat[ed] special education professional development sessions" that received negative feedback in late summer 2021 — around the same time as the ESY program, and just before she reinstated her personnel complaint.  DI 29-3 ¶ 40.  While Ms. Moody had some responsibility in executing these sessions, *see* DI 34-2 ¶ 41, Dr. Brickhouse "oversaw the team tasked" with the presentations, DI 29-3 ¶ 40.  Dr. Brickhouse says she "never received negative complaints regarding professional development," DI 34-2 ¶ 41, but that does not create a dispute of fact as to whether "[m]ultiple attendees" complained, DI 29-3 ¶ 41.

Moreover, there were some alleged differences in treatment that we found meaningful at the pleadings stage, but the record has revealed undisputed explanations.  *See* DI 19 at 15.  We know that the way Dr. Brickhouse described Deputy Berry's demeanor towards her at meetings is similar to how Ms. Moody says Deputy Berry treated her.  *See supra* at 15 n.21.  We know that the "disciplinary write-up" Dr. Brickhouse cited in her complaint, *see* DI 7 ¶ 115, was a memo she received from Deputy Berry for missing work deadlines after several extensions, and that the School District placed the memo in her employee file, *see* DI 29-3 ¶ 103; DI 34-2 ¶¶ 103-04.  The best we can say for Dr. Brickhouse's case in this regard is that (1) Ms. Moody met privately with Deputy Berry more than Dr. Brickhouse, (2) on one occasion, Ms. Moody received work-related information about two weeks faster than Dr. Brickhouse, and (3) Ms. Moody did not receive a disciplinary write-up like Dr. Brickhouse when Dr. Brickhouse failed to timely submit NOREPs.  No reasonable jury could infer intentional discrimination from these minor and justifiable differences in treatment.

Accordingly, we grant the School District's motion with respect to Dr. Brickhouse's hostile work environment cause of action.

### B. Dr. Brickhouse fails to proffer sufficient evidence demonstrating that the School District's concerns with her work performance were pretextual.[32]

"To establish a *prima facie* case of retaliation under Title VII, a plaintiff must tender evidence that: '(1) she engaged in activity protected by Title VII; (2) the employer took an adverse employment action against her; and (3) there was a causal connection between her participation in the protected activity and the adverse employment action.'" *Moore v. City of Philadelphia*, 461 F.3d 331, 340-41 (3d Cir. 2006) (emphasis added) (quoting *Nelson v. Upsala Coll.*, 51 F.3d 383, 386 (3d Cir. 1995)). "Upon making these showings, the employer then, under step two, has the burden of producing evidence that 'present[s] a legitimate, non-retaliatory reason for having taken the adverse action.'" *Canada v. Samuel Grossi & Sons, Inc.*, 49 F.4th 340, 346 (3d Cir. 2022) (alteration in original) (quoting *Daniels v. Sch. Dist. of Phila.*, 776 F.3d 181, 193 (3d Cir. 2015)). "The employer need not prove that the tendered reason *actually* motivated its behavior, as throughout this burden-shifting paradigm the ultimate burden of proving intentional discrimination always rests with the plaintiff." *Fuentes v. Perskie*, 32 F.3d 759, 763 (3d Cir. 1994).

"If the employer meets this burden, the burden then shifts 'back to the plaintiff to

---

[32] To the extent that Dr. Brickhouse tries to prove a retaliatory hostile work environment claim, it fails for the same reasons discussed in Section IV.A. *See Komis v. Sec'y of U.S. Dep't of Lab.*, 918 F.3d 289, 293 (3d Cir. 2019) (alteration in original) (quoting *Jensen v. Potter*, 435 F.3d 444, 449 (3d Cir. 2006)) ("We held in *Jensen v. Potter*, 435 F.3d 344 (3d Cir. 2006), . . . 'our usual [discriminatory] hostile work environment framework applies equally' to claims of retaliatory hostile work environments.").

demonstrate that "the employer's proffered explanation was false, and that retaliation was the real reason for the adverse employment action."'" *Canada*, 49 F.4th at 346 (quoting *Daniels*, 776 F.3d at 193).  "To survive summary judgment when the employer has articulated a legitimate nondiscriminatory reason for its action, the plaintiff must 'point to some evidence, direct or circumstantial, from which a factfinder could reasonable either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action.'" *Simpson v. Kay Jewelers, Div. of Sterling, Inc.*, 142 F.3d 639, 644 (3d Cir. 1998) (quoting *Fuentes*, 32 F.3d at 764).  And "[w]e look at the totality of the circumstances to determine whether an employer's proffered nondiscriminatory reason is pretext for a discriminatory motive."  *Canada*, 49 F.4th at 347.

Assuming, *arguendo*, that Dr. Brickhouse can prove a prima facie retaliation claim,[33] the

---

[33] The School District contests Dr. Brickhouse's ability to prove each element of her prima facie case.  For purposes of our analysis, we will assume — but not conclusively decide — that Dr. Brickhouse's personnel complaint and her EEOC complaint are both "protected activities."  *But see Daniels*, 776 F.3d at 193 (cleaned up) ("Protected 'opposition' activity includes not only an employee's filing of formal charges of discrimination against an employer but also 'informal protests of discriminatory employment practices, including making complaint to management.'  That is, in determining whether a plaintiff adequately opposed discrimination, 'we look to the message . . . conveyed by a plaintiff's conduct rather than the means of conveyance.  The complaint must allege that the opposition was to discrimination based on a protected category, such as age or race."); *Klastow v. Newtown Friends Sch.*, 515 F. App'x 130, 133 (3d Cir. 2013) (quoting *Barber v. CSX Distrib. Servs.*, 68 F.3d 694, 701 (3d Cir. 1995)) ("[A] letter complaining of 'unfair treatment in general,' but not specifically complaining about age discrimination, was not a protected activity . . . .").

The assumption is important because the parties dispute whether Dr. Brickhouse's leadership goals memo is a materially adverse action.  *See* DI 29-2 at 19.  Because Dr. Brickhouse received the memo (September 2021) *prior* to filing her EEOC complaint (November 2021), the memo could not have been retaliation for the EEOC complaint.  For the

School District submits that Dr. Brickhouse's job performance provides an explanation for any action that Dr. Brickhouse argues is materially adverse.  *See* DI 29-1 at 22.[34]  So, the burden returns to Dr. Brickhouse to adduce direct or circumstantial evidence that allows a reasonable jury to disbelieve the School District, or to think that Dr. Brickhouse's race was the more-likely-than-not reason for her treatment.

Dr. Brickhouse has not adduced the direct or circumstantial evidence she needs to survive summary judgment.  *See* DI 41 at 10 n.6.  Her opposition primarily relies on the purported lack of criticism of her work performance until her September 2021 leadership goals meeting.  *See* DI 34 at 18.  To be sure, scrutiny of Dr. Brickhouse's work performance "could show pretext if [she] connects [it] to a discriminatory animus motivating the employer's adverse employment action."  *Fennell v. Comcast Cable Commc'ns. Mgmt., LLC*, 628 F. Supp. 3d 554, 583 (E.D. Pa. 2022).  But Dr. Brickhouse lacks any connection to discriminatory animus other than her own singular representation — which we accept as true — that she told Mr. Chokshi in a phone call that her supervisors' treatment of her was race-related.  *See* DI 34-1 ¶ 4.  That alone falls considerably short of demonstrating "weaknesses, implausibilities, inconsistencies,

---

leadership goals meeting and memo to be considered a materially adverse action, we would have to conclude that Dr. Brickhouse's personnel complaint is a protected activity.

Dr. Brickhouse likely recognizes that her retaliation claim depends on the leadership goals meeting and memo.  She almost exclusively argues that the temporal proximity between her September 13, 2021 meeting with Mr. Chokshi and Dr. Brooks's September 15, 2021 meeting invite demonstrates the causal connection between a protected activity and materially adverse action.  DI 34 at 17; *see* DI 41 at 8 ("The only specific conduct that Dr. Brickhouse attempts to analyze with any particularly is the 2021 Leadership Goals Memo . . . .").

This makes our assumption that Dr. Brickhouse's personnel complaint is a protected activity all the more salient.

[34] This comes despite Dr. Brickhouse's position that the School District has "provided no non-retaliatory reasons for" the actions she thinks are materially adverse.  DI 34 at 19.

incoherencies, or contradictions" in the School District's legitimate, non-retaliatory reason for her treatment. *Fuentes*, 32 F.2d at 765; *cf. Fennell*, 628 F. Supp. 3d at 584 (holding "undoubtedly crude, unprofessional, and inappropriate" comments that "may constitute microaggressions" are insufficient to demonstrate pretext for a materially adverse action). Quite the opposite: the facts reveal no inconsistencies regarding the concerns with Dr. Brickhouse's work performance, other than Dr. Brickhouse's own say-so. *Cf. Canada*, 49 F.4th at 349 (holding employee met burden of showing his employer's reason for searching his cell phone was pretextual where other coworkers "could not provide *any* legitimate basis" for the action).

Because Dr. Brickhouse lacks evidence for a factfinder to discount the School District's legitimate non-retaliatory reason for the actions taken against her, we grant summary judgment on her retaliation claim.[35]

## V.      <u>Conclusion</u>

We grant the School District's motion for summary judgment on Dr. Brickhouse's hostile work environment and retaliation causes of action. For her hostile work environment claim, there is no genuine dispute of material fact regarding whether Dr. Brickhouse suffered from intentional discrimination because of her race. And for her retaliation claim, she has no direct or circumstantial evidence allowing a reasonable jury to conclude that race discrimination is the more-likely-than-not reason for her work environment.

---

[35] We also grant the School District summary judgment on Dr. Brickhouse's retaliation claims under § 1981 and the PHRA for the same reasons.